UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD DEMACE,                    :
                                  :
          Plaintiff               :    No. 3:11-CV-01960
                                  :
     vs.                          :    (Complaint Filed 10/21/11)
                                  :
MICHAEL ASTRUE,                   :
COMMISSIONER OF SOCIAL            :    (Judge Munley)
SECURITY,                         :
                                  :
          Defendant               :

**MEMORANDUM**

**Background**

          The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Ronald Demace's claim for social security

disability insurance benefits and supplemental security income

benefits.

          On November 7, 2008, Demace filed a protective

application[1] for disability insurance benefits and an application

for supplemental security income benefits. Tr. 11, 28, 86-87, 115

and 118-124.[2]  On March 31, 2009, the Bureau of Disability

_____

1. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2. References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on January 9,
2012.

Determination[3] denied Demace's applications. Tr. 88-96. On May 2, 2009, Demace requested a hearing before an administrative law judge. Tr. 99. After approximately 11 months had elapsed, a hearing before an administrative law judge was held on June 10, 2010. Tr. 26-63. On June 22, 2010, the administrative law judge issued a decision denying Demace's applications. Tr. 11-22. As will be explained in more detail *infra*, the administrative law judge found that Demace could perform a range of unskilled, light work.[4] Tr. 14-15. On July 25, 2010, Demace requested that the

_____

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 88 and 92.

4. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

Appeals Council review the administrative law judge's decision.
Tr. 113. After the passage of over 13 months, the Appeals
Council concluded that there was no basis upon which to grant
Demace's request for review. Tr. 1-5. Thus, the administrative
law judge's decision stood as the final decision of the
Commissioner.

Demace then filed a complaint in this court on October
21, 2011. Supporting and opposing briefs were submitted and the
appeal[5] became ripe for disposition on May 1, 2012, when Demace

If someone can do light work, we determine that he or
she can also do sedentary work, unless there are
additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more
than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds. If
someone can do medium work, we determine that he or she
can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more
than 100 pounds at a time with frequent lifting or
carrying of objects weighing up to 50 pounds. If
someone can do heavy work, we determine that he or she
can also do medium, light, and sedentary work.

(e) *Very heavy work*. Very heavy work involves lifting
objects weighing more than 100 pounds at a time with
frequent lifting or carrying of objects weighing 50
pounds or more. If someone can do very heavy work, we
determine that he or she can also do heavy, medium,
light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

5. Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as

3

filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Demace met the insured status requirements of the Social Security Act through March 31, 2011. Tr. 11, 13, 28 and 125.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Demace, who was born in the United States on March 29, 1958, withdraw from school in 1974 after completing the 10th grade. Tr. 37, 86, 115, 122, 140 and 233. Demace can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 37-38, 133 and 169. During his elementary and secondary schooling, Demace attended regular education classes. Tr. 140. After withdrawing from school, Demace did not obtain a General Equivalency Diploma or complete

an appeal." M.D.Pa. Local Rule 83.40.1.

4

any type of job training. Id. Demace is described as a person with a limited education. Tr. 21.

Demace's work history covers a period of more than 30 years. Tr. 126, 146 and 190. In a document filed with the Social Security Administration Demace stated that he performed auto body work on vehicles at a car dealership from 1971 to 1993 and as a sales/repair person at a car lot from 1993 to May, 2008. Tr. 146 and 190. The same document describes these positions as medium work because the heaviest weight Demace lifted was 50 pounds and he frequently lifted 10 to 25 pounds. Tr. 147-149.

Records of the Social Security Administration reveal that Demace had reported earnings in the years 1975 through 1979 and 1984 through 2007. Tr. 126. Demace's total earnings during those 29 years were $281,757.76. Id. Demace's annual earnings ranged from a low of $2152.00 in 1979 to a high of $19,952.00 in 1991. Id. His second highest annual earnings were $19,082.00 in 2001. Id. In 2007 his earnings were S3682.00. Id. Demace had no reported earnings in the years 1980 through 1983 and he has had no reported earnings after 2007. Id.

Demace has past relevant employment[6] as a automobile sales representative and as an auto body worker. Tr. 57. The

_____

6. Past relevant employment in the present case means work performed by Demace during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

sales representative position was described by a vocational expert as unskilled, light work and the auto body worker position as unskilled, medium work. Id.

Demace claims that he became disabled on April 29, 2008, because of low back pain and leg weakness. Tr. 134. The impetus for the low back pain and leg weakness was an injury sustained when he was hit as a pedestrian by an automobile that was being backed up at a car auction. Tr. 231-232. Demace also claims that he was disabled because of diabetes and high blood pressure. Tr. 134.

Demace was 50 years of age on the alleged disability onset date and 52 years of age on the date of the administrative hearing and the issuance of the ALJ's decision. Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id. A vocational expert testified at the administrative hearing that Demace had no transferrable job skills. Tr. 60. If Demace would have been limited to sedentary work and also found to have no transferable job skills, a limited education and unable to perform his prior relevant work, he would have been entitled to disability insurance benefits. See Medical-

Vocational Rules 201.00(g) and 201.09, 20 C.F.R. Part 404,
Subpart P, Appendix 2.

Light work from an exertional standpoint requires an
individual to stand and/or walk for up to 6 hours during an 8-
hour workday and lift and/or carry 20 pounds occasionally (up to
1/3 of an 8-hour workday or 2.67 hours) and 10 pounds frequently
(up to 2/3 of an 8-hour workday or 5.33 hours). SSR 83-10.[7] The
primary issue in this appeal is whether substantial evidence
supports the ALJ's finding that Demace could engage in a range of
full-time light work.

For the reasons set forth below, we will remand this
case to the Commissioner for further proceedings.

**<u>STANDARD OF REVIEW</u>**

When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91

---

[7]. Social Security Ruling 83-10 in relevant part states as
follows: "Light work. The regulations define light work as
lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds. Even though the
weight lifted in a particular light job may be very little, a job
is in this category when it requires a good deal of walking or
standing – the primary difference between sedentary and most
light jobs. . . . 'Frequent' means occurring from one-third to
two-thirds of the time. Since frequent lifting or carrying
requires being on one's feet up to two-thirds of a workday, the
full range of light work requires standing or walking, of and on,
for a total of approximately 6 hours of an 8-hour workday.
Sitting may occur intermittently during the remaining time."

(3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Farqnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d

198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of
whether such work exists in the immediate area in which
he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for
work.  For purposes of the preceding sentence (with
respect to any individual), "work which exists in the
national economy" means work which exists in
significant numbers either in the region where such
individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92.  This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[8] (2) has an impairment that is
severe or a combination of impairments that is severe,[9] (3) has

---

[8] If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

[9] The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20

---

perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's
decision and the arguments of counsel, we will review some of the
medical records.  The administrative record contains medical
records which were presented to the administrative law judge and
additional medical records that were presently only to the
Appeals Council.  In reviewing the administrative law judge's
decision we are to consider only those records that were before
the ALJ. <u>Matthews v. Apfel</u>, 239 F.3d 589 (3d Cir. 2001).

After the alleged onset date of April 29, 2008, Demace
received medical care from several physicians, including Mauer T.
Biscotti, M.D., and Toni Jo Parmelee, D.O.

On May 22, 2008, Demace had an appointment with Dr.
Biscotti. Tr. 225.  The record of this appointment is handwritten
and partially illegible but reveals that Demace complained of
polyuria (excessive or abnormally large production of urine),
polyphagia (excessive hunger or increased appetite), blurred
vision and burning feet. <u>Id.</u>  The only other item noted on this

record was that Demace's blood pressure was 140/90.[12] Id.

The next record that we encounter is a lab report of an HGB A1C blood test. Tr. 228. The result of this test which was performed on or about May 28, 2008, was abnormally high at 15 percent.[13] Id. A notation in handwriting on this laboratory report indicates that Demace was prescribed the drug Glucophage 500 mg twice daily.[14] Id.

---

12. Normal blood pressure is below 120/80; prehypertension is 120-139/80-89; stage 1 hypertension is 140-159/90-99; and stage 2 hypertension is 160/100 or more.  When the top number(systolic) is in the abnormal range and the bottom number (diastolic) is normal, the top number (systolic) is used to classify the patient's condition. See High blood pressure (hypertension), Mayo Clinic Staff, http://www.mayoclinic.com/health/blood-pressure /HI00043/ (Last accessed April 19, 2013).

13. The A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood.  It is used to monitor the control of diabetes mellitus.  Glycohemoglobin is hemoglobin to which glucose is bound.  Glucose stays attached to hemoglobin for the life of the red blood cells, 120 days.  A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months.  The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists. An A1C level of 12 translates to an estimated average glucose of 298. American Diabetes Association, Estimated Average Glucose, http://www. diabetes.org/living-with-diabetes/treatment-and-care/blood-glucos e-control/estimated-average-glucose.html (Last accessed April 19, 2013).  Normal fasting blood glucose is 70-99 mg/dl and normal blood glucose 2 hours after eating is 70-145 mg/dl. Diabetes Health Center, Blood Glucose, WebMD, http://diabetes.webmd.com/ blood-glucose?page=3 (Last accessed August 16, 2012).

14. "Glucophage (metformin) is an oral diabetes medicine that helps control blood sugar levels.  Glucophage is for people with type 2 diabetes." Glucophage, Drugs.com, http://www.drugs.com /glucophage.html (Last accessed April 19, 2013).

On June 16, 2008, Demace had an appointment with Dr. Biscotti at which Demace complained of low back pain radiating to his legs with weakness. Tr. 224. Demace further reported that his blood glucose level tested at home was running greater than 300 mg/dl and that his left leg would "give out." Id. Dr. Biscotti's assessment was that Demace suffered from a low back contusion and non-insulin dependent diabetes mellitus. Id. Dr. Biscotti increased Demace's dosage of Glucophage, ordered x-rays of Demace's lumbar/sacral spine, left hip and pelvis, and left thigh bone (femur), and referred Demace to physical therapy. Id. The report of this appointment does not contain any objective physical examination findings other than Demace's blood pressure was 110/60 and Demace's neck, chest, respiratory system and cardiovascular system were all normal. Id.

On July 14, 2008, Demace had x-rays performed of the left knee, femur and hip and the lumbar spine. Tr. 199-220 and 230. The report of these x-rays states in relevant part as follows:

> Examination of the pelvis and left femur including the hip and knee shows no evidence of fracture or bone disease. The hip and knee joint spaces are maintained.
>
> Impression: Negative pelvis and left femur.
>
> Examination of the lumbar spine shows spondylolisthesis of the L5 on S1 with associated spondylolysis. There is narrowing of the L5-S1 interspace. There is no evidence of fracture. The pedicles, spinous and

transverse processes appear normal.[15]

Impression: Spondylolisthesis L5 on S1 with associated spondylolysis.[16]

---

15. A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. The spinous process is the bone that protrudes and that can be felt when a finger is run along the spine. Spinal muscles attach to this process. The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The pedicles are two short processes made of bone that protrude from the back of the vertebral body. The laminae are two broad plates extending dorsally and medially from the pedicles and fusing to complete the vertebral arch (which is the posterior portion of the vertebra) and encloses the spinal cord. On an axial view of the vertebra, the transverse processes are two somewhat wing-like structures that extend on both sides of the vertebral body from the point where the laminae join the pedicles. The transverse processes serve for the attachment of ligaments and muscles. The endplates are the top and bottom portions of a vertebral body that come in direct contact with the intervertebral discs. The intervertebral discs sit between the vertebral bodies. The intervertebral discs, the soft cushions between the 24 bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and presses the annulus outward or ruptures the annulus. Such bulges(protrusions) and herniations if they contact nerve tissue can cause pain.

16. Spondylolisthesis is a forward slip of one vertebra relative to another. Spondylolisthesis usually occurs towards the base of your spine in the lumbar area. Spondylolisthesis can be described according to its degree of severity. One commonly used description grades spondylolisthesis, with grade 1 being least advanced, and grade 5 being most advanced. The spondylolisthesis is graded by measuring how much of a vertebral body has slipped forward over the body beneath it. Grade 1 spondylolisthesis is where up to 25% of the vertebral body has slipped forward over the vertebral body beneath it. Exams and Tests for Spondylolisthesis, SpineUniverse, http://www.spineuniverse.com /conditions/spondylolisthesis/exams-tests-spondylolisthesis (Last

Tr. 199.

On August 12, 2008, Demace had an appointment with Dr. Biscotti at which Demace complained of back and left leg pain. Tr. 223. Dr. Biscotti's assessment was that Demace suffered from a low back contusion and prescribed the drug Ultram.[17] Id. Dr. Biscotti further noted that Demace could work "at best 2-3 [hours per day]." Id.

On September 15, 2008, Demace was examined by William J. Krywicki, M.D., an orthopedic surgeon, at Geisinger Specialty Clinic, Wilkes-Barre, Pennsylvania. Tr. 198. Dr. Krywicki noted that pain was limiting Demace's ability to work. Id. Dr. Krywicki reviewed the x-rays performed in July and stated that his knee, femur, pelvis were normal but that the x-ray of the

---

accessed April 22, 2013). Symptoms of this condition include pain in the lower back, pain and weakness in one or both legs, and an altered gait. Symptoms of Spondylolisthesis, SpineUniverse, http://www.spineuniverse.com/conditions/ spondylolisthesis/symptoms-spondylolisthesis (Last accessed April 22, 2013). Some people who have this condition exhibit no symptoms. Id. A condition which may cause spondylolisthesis is spondylolysis. This condition "is a specific defect in the connection between vertebrae, the bones that make up the spinal column. This defect can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis. Spondylolisthesis is a very common cause of low back pain." Cleveland Clinic, Diseases & Conditions, Spondylolysis, http://my.clevelandclinic.org/disorders/back_pain/hic_ spondylolysis.aspx (Last accessed April 22, 2013).

17. Ultram is a "narcotic-like pain reliever" which "is used to treat moderate to severe pain." Ultram, Drugs.com, http://www.drugs.com/ultram.html (Last accessed April 22, 2013).

lumbar spine revealed a grade 1-2 spondylolisthesis. Id.  Dr. Krywicki noted that the condition appeared to be "chronic in nature." Id. Other than Demace's hamstrings being "a bit tight" the physical examination findings reported by Dr. Krywicki were normal. Id.  Demace had normal strength in his flexors, abductors and extensors; he had a normal sensory examination in 'all dermatomes;"[18] he had a negative straight leg raising test;[19] and he was unrestricted in the rotational motion of both hips. Id. Dr. Krywicki's plan was to "work on his hip abductors, extensor strengthening along with back extensor and abdominal strengthening" and "see him back then in a time frame of about 6 weeks" and then "[i]f symptoms [were] not improving . . . have him see Neurosurgery." Id.

The record reveals that Demace commenced physical therapy at Physical Therapy Associates of Northeast Pennsylvania on September 18, 2008, and had at least five sessions which ended

18. A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed April 22, 2013).

19. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise (Last accessed March 4, 2013).

on October 16, 2008. Tr. 210-215.

On September 23, 2008, Demace had an appointment with Dr. Parmelee at which Demace complained of back pain and radiating pain across the lower back and into the buttocks. Tr. 261. Demace also complained of tingling and numbness in his left lower extremity and that his left leg was "giving out." Id. Demace told Dr. Parmelee that he had been "walking his dog" but that he would have pain and limping after 20 yards and he would have to stop and rest after walking half a block. Id. Demace further stated that he had pain "when driving longer than one hour" and after sitting in a straight chair for 30 minutes. Id. At the time of this appointment Demace was taking the following medications: lisinopril, metoprolol, verapamil,[20] metformin and tramadol (Ultram). Tr. 262. A physical examination of Demace revealed that he had a large, nontender umbilical hernia; his right calf was larger than his left by 1 centimeter, suggesting possible atrophy of the left calf muscle; and Demace was unable to toe walk with the left lower extremity. Id. Dr. Parmelee's assessment was that Demace suffered from low back pain, lumbar and sacral spondyloarthritis, radicular syndrome of lower limbs, hypertension and non-insulin dependent diabetes mellitus. Tr. 262-263. Dr. Parmelee ordered an MRI of the lumbar spine. Tr.

---

**20.** Lisinopril, metoprolol and verapamil are drugs used to treat high blood pressure. See Drug Index A to Z, Drugs.com, http://www.drugs.com/drug_information.html (Last accessed April 23, 2013).

263.  That MRI which was performed on September 25, 2008,

revealed "[g]rade 1 L5-S1 spondylolisthesis with possible

bilateral spondylolysis of L5, with disc degeneration[21] and facet

---

21. Degenerative disc disease (discogenic disease) has been
described as follows:

> As we age, the water and protein content of the
> cartilage of the body changes. This change results in
> weaker, more fragile and thin cartilage. Because both
> the discs and the joints that stack the vertebrae
> (facet joints) are partly composed of cartilage, these
> areas are subject to wear and tear over time
> (degenerative changes). The gradual deterioration of
> the disc between the vertebrae is referred to as
> degenerative disc disease. . . Wear of the facet
> cartilage and the bony changes of the adjacent joint is
> referred to as degenerative facet joint disease or
> osteoarthritis of the spine. Trauma injury to the spine
> can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as
> spondylosis. Spondylosis can be noted on x-ray tests or
> MRI scanning of the spine as a narrowing of the normal
> "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more
> susceptible to herniation. Degeneration of the disc can
> cause local pain in the affected area. Any level of the
> spine can be affected by disc degeneration. When disc
> degeneration affects the spine of the neck, it is
> referred to as cervical disc disease. When the mid-back
> is affected, the condition is referred to as thoracic
> disc disease. Disc degeneration that affects the lumbar
> spine can cause chronic low back pain (referred to as
> lumbago) or irritation of a spinal nerve to cause pain
> radiating down the leg (sciatica). Lumbago causes pain
> localized to the low back and is common in older
> people. Degenerative arthritis (osteoarthritis) of the
> facet joints is also a cause of localized lumbar pain
> that can be detected with plain x-ray testing is also
> a cause of localized lumbar pain.  The pain
> from degenerative disc disease of the spine is usually
> treated conservatively with intermittent heat, rest,
> rehabilitative exercises, and medications to relieve

joint arthropathy resulting in fairly marked bilateral foraminal encroachment" but "no significant spinal canal compromise."[22] Tr. 229. Also, on September 25, 2008, Demace had an electromyography (EMG) of the lower extremities which revealed the "presence of polyneuropathy[23] and the "presence of L4-L5 radiculopathy

---

pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet. com/degenerativedisc/page2.htm (Last accessed April 22, 2013). Degenerative disc disease is considered part of the normal aging process. Id.

22. "The facet joints connect the posterior elements of the vertebral bodies to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain. The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www.back.com/causes-mechanical-facet.html (Last accessed February 3, 2012). The facet joints are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. Foraminal encroachment is the narrowing of the opening through which nerves roots exit. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine.

23. "Neuropathy is a collection of disorders that occurs when nerves of the peripheral nervous system (the part of the nervous system outside of the brain and spinal cord) are damaged. The condition is generally referred to as peripheral neuropathy, and it is most commonly due to damage to nerve axons [nerve fibers]. Neuropathy usually causes pain and numbness in the hands and feet. It can result from traumatic injuries, infections, metabolic disorders, and exposure to toxins. . . Neuropathy can affect nerves that control muscle movement (motor nerves) and

bilaterally."[24] Tr. 259.

On September 30, 2008, Demace had an appointment with Dr. Biscotti at which Demace complained of back pain and reported that his symptoms were unchanged, including that his left leg was still "giving out." Tr. 222. The report of this appointment does not contain any objective physical examination findings other than Demace's pulse was 60, his blood pressure was 100/70, knee jerks (patellar reflexes) were absent,[25] and reflexes were intact

_____

those that detect sensations such as coldness or pain (sensory nerves). . . . Pain from peripheral neuropathy is often described as a tingling or burning sensation." Medical News Today, What is Neuropathy? Neuropathy Causes and Treatments, http://www.medical newstoday.com/articles/147963.php (Last accessed April 22, 2013). "Polyneuropathy is a specific term that refers to a generalized, relatively homogenous process affecting many peripheral nerves, with the distal nerves usually affected most prominently." Overview of polyneuropathy, UptoDate, http://www.uptodate.com/ contents/overview-of-polyneuropathy (Last accessed April 22, 2013).

24. Radiculopathy is "characterized by pain which seems to radiate from the spine" to other parts of the body, including the extremities. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy,MedicineNet.com,http://www.medicinenet.com/radiculo pathy/article.htm (Last accessed April 22, 2013). A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease. Radiculopathy can cause tingling, numbness and weakness in an extremity.

25. Complete absence of the patellar reflex can be a sign of neurological damage or compression in the L2, L3 or L4 region of the lumbar spine. Nerve Function Tests for Evaluating Low Back Problems, emedincinhealth, http://www.emedicinehealth.com/nerve_ function_tests_for_evaluating_low_back_problems-health/article_em

at the ankles. Id. Dr. Biscotti's impression was that Demace suffered from a lumbar contusion with radiculopathy and directed that he continue light duty which in his previous appointment treatment note of August 12, 2008, was specified to be 2-3 hours of work per day. Id.

On October 17, 2008, Demace had an acute case of pacreatitis and received emergency care from the Wyoming Valley Health Care System, Wilkes-Barre. Tr. 203-209.

Demace had abnormal blood glucose levels of 303 mg/dl and 287 mg/dl on October 18, 2008, and an abnormal reading of 276 mg/dl on October 19, 2008. Tr. 227.

On November 3, 2008, Demace had an appointment with Dr. Biscotti regarding his recent bout with pacreatitis and abnormal blood sugar levels. Tr. 221. The report of this appointment only notes that Demace weighed 234 pounds and that his blood pressure was 118/70. Id.

On November 17, 2008, Dr. Biscotti completed an insurance form for Demace in which he noted that Demace's chief complaint was low back pain with left leg weakness. Tr. 220. Dr. Biscotti further stated that the treatment plan was physical therapy and analgesics, that Demace was disabled and unable to work full-time but that he could return to work on a part-time basis at a light duty level. Id.

On December 16, 2008, Demace had an appointment with

_____

.htm (Last accessed April 22, 2013).

Dr. Parmelee at which Demace complained of low back pain and radiation of pain to the lower legs. Tr. 266. A physical examination revealed, inter alia, loss of lumbar lordosis (normal curvature)and significant muscle spasm; palpation revealed moderate paraspinal spasm and sacroiliac joint tenderness; a positive straight leg raising test bilaterally; a leaning forward gait; normal motor and sensory function; diminished to normal reflexes; and an unremarkable neurologic examination. Tr. 266-267. Dr. Parmelee's impression was that Demace suffered from radicular syndrome of the lower limbs, lumbar and sacral spondyloarthritis, low back pain, high blood pressure and non-insulin dependent diabetes mellitus. Tr. 267.

On December 22, 2008, Dr. Biscotti completed an insurance form on behalf of Demace in which he stated that Demace was disabled from work. Tr. 219.

On January 12, 2009, Demace had an appointment with Dr. Parmelee at which Demace complained of low back pain and radiation of pain to the lower legs. Tr. 268. At the time of this appointment Demace was taking the following medications: lisinopril, metoprolol, verapamil, metformin and tramadol. Tr. 268. The results of a physical examination of Demace were similar to the results of the physical examination performed on December 16, 2008. Dr. Parmelee's impression was that Demace suffered from radicular syndrome of the lower limbs, lumbar and sacral spondyloarthritis, spondylolisthesis, polyneuropathy, low

24

back pain, high blood pressure and non-insulin dependent diabetes mellitus. Tr. 269. Dr. Parmelee prescribed the drugs Lyrica[26] and Vicodin[27] and referred Demace for a neurosurgery consultation. Tr. 269-271.

On January 22, 2009, Demace had an appointment with Akash D. Agarwal, M.D., a neurosurgeon, at the Milton S. Hershey Medical Center, Hershey, Pennsylvania. Tr. 313-315. Other than blood pressure of 167/96 and minimal pain on palpation of the lumbar spine, the results of a physical examination of Demace were normal/unremarkable. Tr. 314. Dr. Agarwal reviewed the MRI of Demace's lumbar spine and noted that it did not reveal evidence of any significant disc herniation or spinal canal stenosis but that it showed at the L5-S1 level a mild grade 1 spondylolisthesis and an area of bilateral foraminal encroachement. Id. Dr. Agarwal recommended conservative treatment prior to considering any surgical intervention. Id. Dr. Agarwal referred Demace to physical therapy and a pain management specialist. Tr. 329-330.

---

26. Lyrica is used, inter alia, "to control seizures and to treat fibromyalgia. It is also used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy), herpes zoster (post-herpes neuralgia), or neuropathic pain associated with spinal cord injury. Lyrica may also be used for other purposes not listed[.]" Lyrica, Drugs.com, http://www.drugs.com/lyrica.html (Last accessed April 23, 2013).

27. Vicodin is a combination of acetaminophen and hydrocodone. Hydrocodone is a narcotic pain reliever. Acetaminophen increases the effects of hydrocodone. Vicodin, Drugs.com, http://www.drugs.com/vicodin.html (Last accessed April 23, 2013).

Demace attended physical therapy at the John Heinz Institute of Rehabilitative Medicine from February 6, 2009, to March 26, 2009. Tr. 273-307. The discharge summary appears to state (the handwriting is difficult to decipher) that Demace reported feeling 50% better but than goes on to state Demace failed to progress with physical therapy. Tr. 297.

On February 26, 2009, Demace was examined by Thomas Barry, D.O., on behalf of the Bureau of Disability Determination. Tr. 231-242. Demace told Dr. Barry that he had back pain, intermittent leg pain which was worse with walking, and radiating pain down the leg to the foot with associated tingling. Tr. 235. After completing a physical examination, Dr. Barry concluded that Demace suffered from obesity; chronic back pain from the foramnal encroachment at the L5 level of the lumbar spine; possible diabetic neuropathy; poorly controlled diabetes; high blood pressure, not well controlled; and a history of chest pain. Tr. 237-238. With respect to the history of chest pain Dr. Barry stated as follows: "In view of diabetes, this is potentially significant as he more than likely has preexisting coronary artery disease and he does have the history of hypertension and he should be seen for his chest pains[.]" Tr. 238.

Dr. Barry completed a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 239-240. In that document Dr. Barry indicated that Demace could occasionally lift and carry 25 pounds and

frequently carry 20 pounds.  Tr. 240.  Dr. Barry further found
that Demace could stand/walk six hours in an 8-hour workday but
appears to indicate that time had to be divided in some fashion;
Demace could sit 8 hours with a sit/stand option; Demace was
unlimited with respect to pushing and pulling, other than shown
under lifting and carrying;  Demace could engage in postural
activities such as bending on an occasional basis; and Demace had
no other restrictions. Tr. 239-240.

On March 31, 2009, a non-medical state agency
adjudicator completed a document entitled "Physical Residual
Functional Capacity Assessment" in which she stated that Demace
could engage in an unlimited range of medium work. Tr. 251-257.

On October 20, 2009, Demace had a CT scan of the lumbar
spine which revealed a "Grade 1 anterolisthesis of L5 over S1[28]
and bilateral sponydlolysis at L5 vertebra" and "[degenerative
joint disease] in the lumbar spine at the L3-4 and L4-L5
levels."[.]" Tr. 308-309.  At the L4-L5 level Demace had a
"[p]osterior disc osteophyte complex and bilateral facet joint
hypertrophy causing moderate spinal stenosis and bilateral neural
foraminal narrowing." Tr. 308.  X-rays on the same day revealed
similar conditions. Tr. 311.

_____

28. "In anterolisthesis, the upper vertebral body is positioned
abnormally compared to the vertebral body below it.  More,
specifically, the upper vertebral body slips forward on the one
below." Cedars-Sinai, Anterolisthesis, http://www.cedars-sinai.
edu/Patients/Health-Conditions/Anterolisthesis.aspx (Last
accessed April 23, 2013).

On October 28, 2009, Demace had an appointment with Dr. Agarwal at which Demace complained of back pain and occasional pain down his right leg and less pain down his left.  Tr. 319. The results of a physical examination were unremarkable. Id.  Dr. Agarwal reviewed the recent x-rays and CT scan and noted that they show "an L5 pars defect"[29] which is "likely contributing to his spondylolisthesis" and that the accident at the car auction likely aggravated a longstanding spondylolisthesis. Tr. 320.  Dr. Agarwal recommended a back brace for a minimum of six weeks to see if it would improves Demace's back and leg pain. Id.

On November 25, 2009, Demace had an appointment with Dr. Parmelee at which Demace complained of low back pain, radiation of pain to the lower extremities and tingling and numbness in the toes. Tr. 347. At the time of this appointment Demace was taking the following medications: Darvocet,[30] Neurontin,[31] lisinopril, metoprolol, verapamil, metformin and Soma.[32] Id. The record of this appointment does not set forth any

---

29. The pars is a portion of the lamina between the superior and inferior facet joints. See nn. 15 and 22, *supra.*

30. Darvocet is a narcotic pain reliever. Darvocet, Drugs.com, http://www.drugs.com/darvocet.html (Last accessed April 23, 2013).

31. Neurontin is used to treat several conditions including nerve pain. Neurontin, Drugs.com, http://www.drugs.com/neurontin.html (Last accessed April 23, 2013).

32. Soma is a muscle relaxant. Soma, Drugs.com, http://www.drugs.com/soma.html (Last accessed April 23, 2013).

objective physical examination findings other than Demace's pulse was 76, his blood pressure was 104/60 and he weighed 242 pounds. Id. Dr. Parmelee's assessment was that Demace suffered from low back pain, spondylolisthesis, lumbar and sacral spondyloarthritis, radicular syndrome of lower limbs, knee pain, ambulatory dysfunction, high blood pressure, non-insulin dependent diabetes mellitus, adjustment reaction with anxious mood, hyperlipidemia and diabetes mellitus, type 2, uncontrolled. Tr. 347-348. Dr. Parmelee noted that Demace would continue to ambulate with a cane. Tr. 348.

An x-ray of Demace's knee on December 7, 2009, revealed mild degenerative changes. Tr. 310.

On December 9, 2009, Demace had an appointment with Dr. Agarwal at which Demace complained of back pain and occasional leg pain. Tr. 3121-322. The record of this appointment reveals that there was an administrative oversight and Demace was not issued a back brace after the last appointment. Id. Dr. Agarwal again prescribed a back brace for Demace. Id.

The next appointment with Dr. Agarwal was on January 27, 2010, at the conclusion of which Dr. Agarwal referred Demace to a neurosurgeon for an evaluation because he was unsure whether Demace would benefit from "a lumbar fusion of his congenital pars defect and his spondylolisthesis." Tr. 323-324. That consultation with a neurosurgeon, Carlo M. de Luna, M.D., occurred on February 3, 2010. Tr. 327-328. After performing a physical examination

and reviewing the CT scan of Demace's lumbar spine, Dr. de Luna's

impression in relevant part was as follows:

> Neurologically he shows no strong signs of a
> specific radiculopathy or myelopathy[33] but he reports
> having had an EMG nerve conduction study which was read
> as "nerve damage." His CAT scans show an unstable
> spondylolisthesis.  This manifest as a grade 1
> subluxation[34] where the disc space distracts on
> extension with a mild rotational component but does
> not sublux on flexion. I explained to the patient that
> his spondylolisthesis was chronic and predated his
> accident. I suspect the accident worsened his
> preexisting condition. . . The natural history of
> spondylolisthesis was also reviewed.  I explained that
> it was unlikely to resolve spontaneously and his best
> chance for long-term relief would be a surgical fusion;
> however, in the absence of any acute deficits he does
> not require an urgent decompression or fusion at this
> time. I advised him to consider his options and he has
> instructions to follow-up with me in the future if he
> feels the condition worsens[.]

Tr. 327.

The last relevant record that we encounter is a report

of an appointment Demace had with Dr. Agarwal on February 10,

2010. Tr. 325-326.  Other than the observation of diffuse pain on

palpation of Demace's lumbar spine, the results of a physical

examination were normal. Tr. 325.  At this appointment Dr.

Agarwal "asked [Demace] to consider an L5-S1 posterior lumbar

---

33. Myelopathy is defined as "any of various functional
disturbances or pathological changes in the spinal cord, often
referring to nonspecific lesions[.]" Dorland's Illustrated
Medical Dictionary, 1220 (32nd Ed. 2012).

34. Subluxation is "an incomplete or partial dislocation."
Dorland's Illustrated Medical Dictionary, 1791 (32nd  Ed. 2012).
Spondylolisthesis is another name for spinal subluxation.

fusion for his spondylolisthesis and leg pain." <u>Id.</u>

**<u>DISCUSSION</u>**

The administrative record in this case is 453 pages in length, primarily consisting of medical and vocational records. Demace basically argues that in setting Demace's residual functional capacity the administrative law judge failed to appropriately consider the medical evidence and the credibility of Demace, including inappropriately relying on her lay medical opinion. We have thoroughly reviewed the relevant portions of the record and find substantial merit in Demace's arguments.

The administrative law judge at step one of the sequential evaluation process found that Demace had not engaged in substantial gainful work activity since April 29, 2008, the alleged disability onset date. Tr. 13. The ALJ specifically stated as follows: "Claimant testified he was self employed until May 2008, that he worked only a few hours per day at the business, and that he was having trouble working for those few hours. Based on the evidence of record the undersigned would find that although the claimant worked after the alleged disability onset date, this work activity did not rise to the level of substantial gainful activity and was part time work." <u>Id.</u>

At step two of the sequential evaluation process, the administrative law judge found that Demace had the following severe impairments: "lumbar degenerative disc disease, obesity

and diabetes mellitus." Id.  The administrative law judge found
that Demace's knee problems and high blood pressure were non-
severe impairments. Tr. 14.  Although the ALJ refers to
polyneuropathy and radiculopathy in the body of her decision, she
does not address whether or not those conditions were medically
determinable, severe or non-severe impairments.  Instead she
merely states without pointing to a medical opinion that
"[c]linical correlation was not found during evaluation in 2009
and 2010." Tr. 16.  The EMG performed on September 25, 2008,
revealed polyneuropathy and L4-L5 radiculopathy and no physician
opined that those were not valid medically determinable
conditions.  The ALJ asserted her lay medical opinion when she
stated that there was no clinical correlation.  Dr. Parmelee
repeatedly found that Demace suffered from radicular symptoms in
the lower extremities and also found in January, 2009, that
Demace suffered from polyneuropathy and prescribed the drug
Lyrica which is used, inter alia, to treat individuals with
diabetic neuropathy and neuropathic pain associated with spinal
cord injury.

        At step three of the sequential evaluation process the
administrative law judge found that Demace's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 14.

        At step four of the sequential evaluation process the

administrative law judge found that Demace could not perform his past relevant work but that he had the residual functional capacity to engage in a range of light work. Tr. 14. In setting the residual functional capacity, the ALJ found that Demace's statements concerning his pain and limitations were not credible. Tr. 15. This credibility judgment was defective because of the errors committed at step two of the sequential evaluation process and, as argued by Demace, because the ALJ did not consider his substantial work history in assessing his credibility.

At step five, the administrative law judge, based on the residual functional capacity of a limited range of light work and the testimony of a vocational expert, found that Demace had the ability to perform work as a cashier, usher and cafeteria attendant and that there were a significant number of such jobs in local, state and national economies. Tr. 22. The ALJ's step five analysis is not supported by substantial evidence because of the errors mentioned above which we further elaborate on below.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential

evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c).
If a claimant has no impairment or combination of impairments
which significantly limit the claimant's physical or mental
abilities to perform basic work activities, the claimant is "not
disabled" and the evaluation process ends at step two. Id.  If a
claimant has any severe impairments, the evaluation process
continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a
medical condition severe at step two will not render a decision
defective if some other medical condition was found severe at
step two.  However, all of the medically determinable impairments
both severe and non-severe must be considered at step two and
then at step four when setting the residual functional capacity.
The social security regulations mandate such consideration and
this court has repeatedly so indicated. See, e.g., Christenson v.
Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18,
2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at
19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue,
Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27,
2011)(Caputo, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

     As noted above the record reveals that in addition to
the conditions found by the ALJ, Demace was diagnosed with
polyneuropathy and radiculopathy.  The failure of the
administrative law judge to find those condition as a medically
determinable impairments, or to give an adequate explanation for

discounting them, makes the ALJ's decisions at steps two and four of the sequential evaluation process defective.

The administrative law judge rejected the opinions of Demace's treating physicians, Dr. Parmelee and Dr. Biscotti, that Demace could only engage in part time light duty work. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative

law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." <u>Schmidt v. Sullivan</u>, 914 F.2d 117, 118 (7th Cir 1990).

In rejecting the opinions of Dr. Parmelee and Dr. Biscotti, the administrative law judge engaged in inappropriate lay analysis of the medical records and failed to appropriately consider the credibility of Demace. In light of the medical evidence that we reviewed in this memorandum, the administrative law judge failed to give an adequate reason for rejecting the opinions of the treating physicians.

The administrative law judge in evaluating Demace's credibility did not consider his lengthy work history. As noted earlier in this order, Demace has an extensive work history. "When a claimant has worked for a long period of time, [his] testimony about [his] work capabilities should be accorded substantial credibility." <u>Rieder v. Apfel</u>, 115 F.Supp.2d 496, 505 (M.D.Pa. 2000)(<u>citing</u> <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979)). The administrative law judge did not give an adequate reason for discrediting Demace's testimony.

Finally, in rejecting the opinions of the treating physicians, the administrative law judge relied in part on what she referred to as the opinion of a state agency medical consultant who after reviewing Demace's medical records found

36

that Demace could work at the medium exertional level. Tr. 20. However, this was a legal and factual error because the individual, Melissa A. Seelye, who reviewed Demace's medical records was not a physician but a non-medical state agency adjudicator.  Tr. 255.

This court has repeatedly found such statements from non-medical disability adjudicators insufficient evidence of a claimant's residual functional capacity. See, e.g., Ulrich v. Astrue, Civil No. 09-803, slip op. at 17-18 (M.D.Pa. December 9, 2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662, slip op. at 15 (M.D. Pa. December 23, 2010)(Muir, J.); Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16 (M.D.Pa. January 11, 2011)(Muir, J.);  Peak v. Astrue, Civil No. 10-889, slip op. at 25 (M.D.Pa. January 24, 2011)(Muir, J.); see also Dutton v. Astrue, Civil No. 10-2594, slip op. at 22 n. 32(M.D.Pa. January 31, 2012)(Munley, J.)

With respect to the reliance on a form completed by the state agency disability examiner, administrative law judges have been instructed to accord such documents no evidentiary weight. See Doc. 12, pages 14-15 in Edwards v. Astrue, Civil No. 10-126 (M.D.Pa.)(quoting a memorandum from the Chief Administrative Law Judge stating the policy of Social Security Administration prohibits Administrative Law Judges from according any weight to forms completed by the non-medical state agency disability

examiners).

Although there is other evidence that arguably supports the ALJ's residual functional capacity assessment – the opinion of Dr. Barry –  the ALJ used the opinion of the non-medical state agency adjudicator to buttress her rejection of the treating physicians' opinions and we do not know how the ALJ would have viewed those opinion in the absence of the opinion of the non-medical state agency adjudicator.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge

Dated: April 25, 2013